136

1                UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF WASHINGTON
2

UNITED STATES OF AMERICA,        ) Case No. 2:17-CR-0067-SMJ
3
                    Plaintiff,   ) September 6, 2017
4                                )
v.                               ) Spokane, Washington
5                                )
CARLOS TORRES MEDRANO, JR.,      ) Contested Motion Hearing
6                                ) Volume No. II
_____Defendant.___  ) Pages 136 to 179
7

8
           BEFORE THE HONORABLE SALVADOR MENDOZA, JR.
9              UNITED STATES DISTRICT COURT JUDGE

10
                         APPEARANCES:
11
For the Plaintiff:          Caitlin A. Baunsgard
12                          Caitlin.Baunsgard@usdoj.gov
                            U.S. Attorney's Office - SPO
13                          920 W. Riverside
                            Suite 300
14                          Spokane, WA 99210
                            509-353-2767
15
For the Defendant:          Walter Lynn Ayers
16                          Walter@ayerslawfirm.net
                            Zachary Ayers
17                          Ayers Law Firm
                            1312 N. Monroe
18                          Suite 133
                            Spokane, WA 99201
19                          509-863-1432

20
For the Witness Brittany    Jeffrey Scott Niesen
21 Cannon:                  Jsniesen1@yahool.com
                            Jeffrey S. Niesen Law Office
22                          1411 W. Pinehill Road
                            Spokane, WA  99218
23                          509-822-7141

24

25

137

1   Official Court Reporter:         Kimberly J. Allen, CCR #2758
                                     United States District Courthouse
2                                    P.O. Box 685
                                     Richland, Washington 99352
3                                    (509) 943-8175

4   Proceedings reported by mechanical stenography; transcript
    produced by computer-aided transcription.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

138

**INDEX**

**Proceedings:**                                                        **Page**

      Argument by Mr. Zachary Ayers       155
      Argument by Ms. Baunsgard          159
      The Court's Ruling               164

**WITNESS INDEX**

**Plaintiff Witness:**                                                  **Page**


**JEREMY TAYLOR**
      Further Rebuttal Direct Examination By Ms.  152
      Baunsgard

*****

**Defense Witnesses:**                                                  **Page**


**BRITTANY CANNON**
      Direct Examination By Mr. Walter Ayers    143
      Cross-Examination By Ms. Baunsgard       145
      Redirect Examination By Mr. Walter Ayers  149

**EXHIBITS ADMITTED**

**Plaintiff**
**Number**      **Description**               **Page**

      None

**Defense**
**Number**      **Description**               **Page**

      None

139

1                          <u>**GENERAL INDEX**</u>

2                                                        **Page**

3
   Reporter's Certificate..............................179
4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

KIMBERLY J. ALLEN, CRR, RPR, CSR
OFFICIAL COURT REPORTER

1  (September 6, 2017; 8:21 a.m.)

2          THE COURTROOM DEPUTY:  Please rise.

3          (Call to Order of the Court.)

4          THE COURT:  Please be seated.

5          THE COURTROOM DEPUTY:

6          Matter before the Court is *United States versus Carlos*

7  *Torres Medrano, Jr.*, Cause No. CR-17-67-SMJ.  Time set for

8  contested motion hearing, Day 2.

9          Counsel, please state your presence for the record.

10         MS. BAUNSGARD:  Caitlin Baunsgard on behalf of the United

11  States.  I have Special Agent Adam Julius with me at counsel

12  table.

13         THE COURT:  Good morning you two.

14         MR. WALTER AYERS:  Good morning, Your Honor.  Walter

15  Ayers and Zachary Ayers on behalf of Mr. Medrano.

16         THE COURT:  Good morning.  Good morning, Mr. Medrano.

17         THE DEFENDANT:  Good morning.

18         MR. NIESEN:  And Jeffrey Niesen on behalf of the witness,

19  Your Honor.

20         THE COURT:  Very well.  Good morning to all of you.

21         Good morning, Ms. Cannon.

22         THE WITNESS:  Good morning.

23         THE COURT:  Ms. Cannon, have you had an opportunity to

24  meet with your attorney?

25         THE WITNESS:  Yes.

1        THE COURT:  Are you fully prepared to go forward at this

2   time?

3        THE WITNESS:  Yes.

4        THE COURT:  Okay.  Do you need additional time?

5        THE WITNESS:  No, not -- not at this time.

6        THE COURT:  Very well.

7        And, Mr. Niesen, you've had an opportunity to discuss

8   matters that you need to with the witness?

9        MR. NIESEN:  Yes.

10       THE COURT:  Very well.  Then let's proceed forward.

11       Mr. Ayers.

12       MR. WALTER AYERS:  Thank you, Your Honor.

13       There is one preliminary matter that I apologize to the

14  Court that I overlooked yesterday.

15       THE COURT:  Yes.

16       MR. WALTER AYERS:  And that is that when Ms. Baunsgard

17  made that motion, I forgot to ask her for and ask the Court if

18  they'd make her give an offer of proof, her basis for making the

19  motion that Ms. Cannon should -- could take the Fifth Amendment

20  or would need to take the Fifth Amendment in this case.  We

21  didn't get any factual basis for that.  And I would ask only the

22  Court ask her if she has a factual basis for raising that issue.

23       THE COURT:  Very well.  It seems fair.

24       MS. BAUNSGARD:  My concern with the witness' testimony,

25  as I articulated yesterday during my objection, was my concern

1  was financial aid is a federally funded based program, at the

2  end of the day, and my concern was Ms. Cannon was about to

3  testify that she used that financial aid for a manner or method

4  not -- not intended by the financial aid purpose, which would be

5  for the purpose of education and associated expenses.  My

6  concern was that she was going to get herself into a sticky

7  situation.  That's why I immediately brought it to the Court's

8  attention as soon as I recognized the issue.

9        THE COURT:  Okay.

10        MS. BAUNSGARD:  I have no presentment other than that,

11  and just concern for the witness' rights.

12        THE COURT:  Okay.  Thank you.

13        MR. WALTER AYERS:  I would dispute that, Your Honor.

14  I -- having worked in higher education, knowing how FAFSA works,

15  it's very seldom that expenditure of those funds -- after

16  they're disbursed initially to the college, and then the rest of

17  the funds are given to the student, those funds are for their

18  living expenses.  And I don't think -- I don't think that motion

19  was made in good faith.

20        THE COURT:  Okay.

21        MR. WALTER AYERS:  But, anyway, in any event --

22        THE COURT:  A couple of things.  Hold on, Mr. Ayers.

23  First of all, I disagree with you.  I do think it was made in

24  good faith.  In fact, I appreciated the motion.

25        Having said that, a person is entitled to use financial

1  aid for the purpose of housing and/or transportation.

2  Apparently, that's what she was going to testify to at that

3  time.  Out of an abundance of caution, the Court felt that the

4  motion was well made, and -- and I like lawyers; it's great to

5  have another one in the courtroom.

6          And so we're going to go forward.

7          MR. WALTER AYERS:  Thank you, Your Honor.  I've had good

8  conversation with Mr. Niesen, as well -- as well as my client.

9

10                        BRITTANY CANNON,

11  having been previously sworn or affirmed, testified under oath

12                        as follows:

13

14                      DIRECT EXAMINATION

15  BY MR. WALTER AYERS:

16  Q    With regards to -- did you have a conversation with Officer

17  Brooks?  Correct?

18  A    Yes.

19  Q    Did you tell him or did he ask you where the money came

20  from?

21  A    Um, yes, he did.

22  Q    What, if anything, did you tell him?

23  A    He asked -- well, he asked why he had the money and how, if

24  I wasn't employed, I had it.  So, um, I told him that it was

25  from -- this part of it was from my financial aid loans, um, to

1  put a deposit on a place for us to live, since we were a couple

2  and having, um, a baby shortly.  So ...

3  Q    Okay.  And did you -- did you have any conversations about

4  a 2002 Jeep?

5  A    Yes.

6  Q    And what -- tell me about that.

7  A    Um, that my boyfriend had sold, um, a Jeep that was mine,

8  and so he had money from that as well.

9  Q    Okay.

10  A    And --

11  Q    So you had given all your money to Carlos?

12  A    Um, no, not all of it.

13  Q    Okay.  But you were in a relationship with him, and he

14  managed your money?  He helped you manage the money?

15  A    Yes, I would say helped.

16  Q    Is there a reason why you had difficulty finding housing?

17  A    Um, well, it had only been a couple months since then, and,

18  um, he was on unemployment, and a lot of apartments don't take,

19  um, my financial aid as income, so -- and since I was about to

20  have a baby, I wasn't working at the time.

21  Q    Did you have any trouble finding an apartment because

22  Carlos had prior convictions?

23  A    Yeah.  Yes.  Well ...

24  Q    Did Brooks ever give you the money back?

25  A    No.

USA v. Medrano/2:17-CR-0067-SMJ                                    145
Contested Motion Hearing- Volume II/September 6, 2017
Cannon/X/Baunsgard

1  Q    Okay.  Did you ever -- did Brooks ever talk to you about

2  getting a search warrant for the car?

3  A    Yes.

4  Q    What, if anything, did he say to you?

5  A    Um, he said that he would rather not, um -- he doesn't want

6  to have to go get a search warrant for the car, and -- that's

7  what he said.

8        THE COURT:  Counsel, she testified about this yesterday.

9        MR. WALTER AYERS:  Okay.  Your Honor, with regards to

10 that, that is the last area that I needed to -- I wanted to make

11 sure I'd covered.  I apologize if I double up on the Court.

12       THE COURT:  All right.

13       MR. WALTER AYERS:  But I have no further questions of

14 her.

15       THE COURT:  All right.  Thank you.  Ms. Baunsgard.

16

17                      CROSS-EXAMINATION

18 BY MS. BAUNSGARD:

19 Q    Good morning.

20 A    Good morning.

21 Q    You've testified yesterday and again today that Officer

22 Brooks had asked you about the source of the funds that Carlos

23 had on his person; is that correct?

24 A    Yes.

25 Q    And you indicated that you had told him, "him" meaning

1  Officer Brooks, that he was on assistance and that the money --

2  some of the money came from your financial aid; is that correct?

3  A    Assistance, no.

4  Q    So you were telling -- your testimony is that you told

5  Officer Brooks that the money Carlos had on his person came

6  partially from your financial aid and partially from a Jeep?

7  A    Yes.

8  Q    Do you own more than one Jeep?

9  A    No.

10  Q    So why, then, over the last two weeks or so have you and

11  Carlos been having a conversation over the recorded jail phone

12  calls about fixing up that Jeep so you can sell it?

13  A    He had two Jeeps.

14  Q    So there are two Jeeps?

15  A    He had -- he owned one, yes.

16  Q    We'll go back to your discussion with Officer Brooks.

17  Officer Brooks recalls that he asked you about the money, and

18  you told Officer Brooks that Carlos was on assistance.

19       Is that correct?  And that's where the money came from?

20  A    As I remember, um, he asked me how Carlos got -- was making

21  ends meet, um, as far as income, and I told him that he was on

22  unemployment.

23  Q    Okay.  And did he inquire further about the source of

24  funds?

25  A    He -- yes.

1  Q    And what did you say?

2  A    He -- he was asking me -- or he was just saying it didn't

3  make sense that he had the money, and I just -- I just said that

4  was because we were in a relationship, and I was about to have

5  his child, so ...

6  Q    All right.  Did you say -- when Officer Brooks asked you to

7  further explain what was going on, did you say, "I don't want to

8  say anything else because I don't know what's going on"?

9  A    Um, I -- I think I said that, but I think it was to a

10 different question he asked.

11 Q    And then followed quickly by, "Can I have his money?"

12 A    No.

13 Q    So if Officer Brooks has notated that in his report as a

14 direct quote from you, that would be incorrect?

15 A    It would have been my -- me saying, "Can I have my money?"

16 Q    Not "his money"?

17 A    No.

18 Q    And you at the time of this incident, which was in March of

19 2017, March 28th, you were not employed?

20 A    No.

21 Q    But I believe your testimony earlier on direct examination

22 was that you were a heroin addict?

23 A    Um, I'm an addict in recovery, yes.

24 Q    And when did you begin recovery?

25 A    Um, 2015; December, um, 20th, 2015.

1  Q    And so your testimony is you've been clean since 2015?

2  A    Um, I wish to invoke my Fifth Amendment right, and, um --

3         (Counsel and the witness conferring.)

4  A    Yeah, I'm taking the Fifth Amendment on that question.

5         (Counsel and the witness conferring.)

6  A    And I'm not responding on that basis.

7  Q    Okay.  So if there's a text message on March 27th, the day

8  before this incident from you to Mr. Medrano saying, "Let's get

9  clean together right now," that's not referring to you

10 possessing and using heroin?

11 A    Um, I wish to invoke my Fifth Amendment right and not

12 respond on that basis.

13 Q    Were you referencing Mr. Medrano getting clean?

14 A    I wish to invoke my Fifth Amendment right and not respond

15 on that basis.

16 Q    And were you such a significant heroin addict during this

17 time frame that you were using heroin while you were pregnant?

18 A    I wish to invoke my Fifth Amendment right and not, um,

19 respond on that basis.

20 Q    If I ask you any additional question about your possession

21 or use of heroin during this hearing today, will you continue to

22 invoke your Fifth Amendment right?

23 A    Yes.

24         MS. BAUNSGARD:  If I could have just a moment?

25         THE COURT:  Sure.

1        (Counsel conferring.)

2   BY MS. BAUNSGARD:   (Continuing)

3   Q    Do you know how much Carlos sold that Jeep for?

4   A    I don't, no.

5        MS. BAUNSGARD:   I don't have any further questions.

6        THE COURT:   Any additional questions?

7        MR. WALTER AYERS:   I just have one, Your Honor, and I

8   apologize; I missed it a few moments ago.

9

10                      REDIRECT EXAMINATION

11  BY MR. WALTER AYERS:

12  Q    Ms. Cannon, did Officer Brooks ever ask you if Carlos --

13  Carlos was under supervision of Department of Corrections?

14  A    Yes.

15  Q    And what was your response?

16  A    I believe I said "no."

17  Q    And --

18  A    I'm --

19  Q    Go ahead.

20  A    I'm not 100-percent sure about that.

21  Q    How many times did he ask you if Carlos was on DOC?

22  A    He had just asked me if he was on probation, and also if

23  he's ever been on probation that I know of.

24  Q    And when he asked you if he'd ever been on probation, what

25  was your response?

1  A     "Yes."

2         MR. WALTER AYERS:  I have no further questions, Your

3  Honor.

4         THE COURT:  Very well.

5         Ms. Baunsgard.

6         MS. BAUNSGARD:  That doesn't raise any issue for me.

7  Thank you.

8         THE COURT:  Very well.  Is this witness excused?

9         MR. WALTER AYERS:  Yes, Your Honor.

10        THE COURT:  Ms. Baunsgard?

11        MS. BAUNSGARD:  Oh, I apologize.  Yes.  Thank you.

12        THE COURT:  Thank you.  You are excused.

13        THE WITNESS:  Thank you.

14        MR. NIESEN:  And with that, I'm going to withdraw as

15 well.

16        THE COURT:  Thank you.

17        MR. NIESEN:  Thank you.

18        THE COURT:  Ms. Cannon, if you wish to remain in the

19 courtroom now, you can.  Okay.

20        Any additional witnesses?

21        MR. WALTER AYERS:  No, Your Honor.

22        THE COURT:  Any rebuttal?

23        MS. BAUNSGARD:  Just one moment.

24        THE COURT:  Okay.

25        (Counsel conferring.)

1         MS. BAUNSGARD:  One rebuttal witness.  We would re-call

2   Officer Jeremy Taylor just very briefly.

3         THE COURT:  Okay.

4         MS. BAUNSGARD:  Very brief.

5         THE COURT:  Okay.

6         MS. BAUNSGARD:  I can put some preamble so the Court

7   understands my thought process --

8         THE COURT:  Thank you.

9         MS. BAUNSGARD:  -- if the Court would like.

10        I feel that I did a disservice to the case yesterday.  I

11  was focusing on my case presentation on the reasonable cause

12  aspect of it, so up to the search, and I don't -- I didn't

13  discuss with the witnesses on direct examination and really pull

14  out the facts and circumstances once they got into the car and

15  moving forward.

16        And we addressed some of that yesterday afternoon with

17  the Court by re-calling those witnesses, but I wanted Officer

18  Taylor to be able to explain himself, and I know the Court

19  indicated some confusion with the safe in the front passenger

20  seat, and Officer Taylor wishes to clarify himself further on

21  that point.

22        THE COURT:  He can clarify himself as much as he wants,

23  and the Court was only confused because Officer Taylor decided

24  to mislead the Court based upon the testimony that he provided.

25  But if you'd like to put him on the stand, you certainly can.

1        MS. BAUNSGARD:  I will.

2        THE COURT:  Okay.

3        (Witness approached.)

4        THE COURT:  Good morning, sir.  You are still under oath.

5        THE WITNESS:  Yes, sir.

6

7                 FURTHER REBUTTAL DIRECT EXAMINATION

8    BY MS. BAUNSGARD:

9    Q    Yesterday there was some questioning about your

10   observations in Mr. Medrano's vehicle.

11        Do you remember that testimony?

12   A    Yes, ma'am.

13   Q    And the issue was brought up and discussed about the fact

14   that there were -- there were two safes, and then there was

15   further discussion about the safe in the front passenger seat

16   and what you observed and when you observed that.

17        Do you recall that testimony?

18   A    I do.

19   Q    And if I recall your testimony correct yesterday -- and

20   please correct me if I'm wrong -- was that at the time of your

21   testimony yesterday you were not able to recall whether or not

22   you could see inside that box in the front passenger seat; is

23   that correct?

24   A    Correct.

25   Q    And since your testimony yesterday have you had the

1   opportunity to refresh your recollection?

2   A     I have.

3   Q     And what did you use to refresh your recollection?

4   A     Uh, my report that I wrote for that incident.

5   Q     And when did you write or author that report?

6   A     On the date after the incident; I believe the 28th, 29th.

7   Q     So was your memory more fresh at that point than it was

8   when you testified yesterday?

9   A     It was, yes.

10  Q     And based on your refreshed recollection, when you

11  approached that vehicle before you searched it, pursuant to DOC

12  conditions, did you observe a safe, or a box containing a safe

13  in the front passenger seat?

14  A     I did, yes.

15  Q     And could you further articulate what you observed to the

16  Court.

17  A     So on the front passenger seat of the Cadillac was a box.

18  I -- you know, a cardboard box.  Inside of it I could clearly

19  see what I observed to be a gray-colored or dark-colored safe,

20  from outside of the car.

21  Q     And so you could see inside the box that there was a safe

22  in the box?

23  A     Yes, ma'am.

24  Q     And is there any reason -- or what was the reason, if there

25  was any, that you didn't more specifically articulate that

 1  yesterday during your testimony, that the safe was in the box?

 2  A    Uh, it didn't have any evidentiary value, so I didn't

 3  follow -- I didn't look into that.  I didn't think about that,

 4  to be honest.

 5  Q    So, in your mind, your focus was on the fact there was a

 6  safe in the front seat?

 7  A    Yes.

 8  Q    And the fact that it was contained in an open box didn't

 9  have much significance to you?

10  A    No, it did not.

11  Q    As you sit here today, based on your observation of a safe,

12  and putting into the context that it was a safe in a box, is

13  that change of significance to you in any way when forming your

14  rationale to search Mr. Medrano's vehicle under his DOC

15  conditions?

16  A    No.  I think it just adds to the totality of circumstances

17  continuous that, uh -- that belief of a reasonable search in the

18  sense that, um, again, the great majority of our offenders do

19  not have safes like that for personal need.  So ...

20  Q    And your testimony -- on your testimony yesterday, were you

21  in any way trying to mislead the Court about the fact that this

22  safe was in a box?

23  A    No, I was not.

24  Q    It just was not important for you?

25  A    Correct.  Correct.

1        MS. BAUNSGARD:  I don't have any further questions for

2   this witness.

3        THE COURT:  Any additional questions?

4        MR. ZACHARY AYERS:  Your Honor, no further questions

5   because the witness has admitted he's changed his testimony.

6   Thank you.

7        THE COURT:  All right.  Thank you, sir.  You're excused.

8        MS. BAUNSGARD:  And I have no further rebuttal.

9        THE COURT:  Argument?  This is a defense motion.

10       MR. ZACHARY AYERS:  Yes, Your Honor.

11       Your Honor, if I may, before I get to our main legal

12   argument, if I may supplement it with a statement that

13   Mr. Medrano would like to make, if that is okay with the Court.

14       THE COURT:  No, it's not.

15       MR. ZACHARY AYERS:  Okay.  Then I'll proceed with my

16   legal argument.  Thank you, Your Honor.

17       THE COURT:  Go ahead.

18       MR. ZACHARY AYERS:  Your Honor, Officer Brooks' contact

19   and stop of Mr. Medrano in this case was arbitrary after the --

20   after he had found that he was in violation of DWLS third.

21   Officer Brooks had no reasonable suspicion or cause to search

22   that car or have DOC search that car.  Officer Taylor had no

23   reasonable cause to search that car.

24       It says specifically in Mr. Medrano's release conditions

25   that reasonable cause is required.

1    The Court, as it's been stated previously, must look at

2  the totality of the circumstances.  There was -- you have the

3  search clause.  You have no articulated facts on behalf of

4  Officer Brooks or Officer Taylor of what was actually in that

5  car.  There's no drugs found on Mr. Medrano's person.  There was

6  no guns found on Mr. Medrano's person.  There was only money.

7  We've seen the explanation of the money come forward from

8  Ms. Cannon and Mr. Medrano.

9    Mr. Medrano was contacted based on a hasty turn and a

10 bench warrant for that driving suspended third.  There's no

11 evidence -- all the information for the driving suspended third

12 was on Officer Brooks' computer.  There was no reason to search

13 the car based on driving suspended third.  There was no -- as

14 you see, there's no articulable facts of drugs and guns being in

15 the car by either Brooks or Taylor.

16   Brooks knew that he did not have reasonable cause to

17 search the car because he asked Mr. Medrano and Ms. Cannon if

18 Mr. Medrano was on probation, and he also admitted openly in

19 court that he really wanted to know, and I quote, "I really

20 wanted to know what's in this car," or "I'm really interested to

21 see what's in this car."  That statement shows his intent that

22 he wanted to get in that car, and he didn't have the reasonable

23 cause to enter that car.

24   Statements he made to Ms. Cannon further that add to

25 that -- I don't want to have to get a warrant; tell me where the

1   drugs are, and I'll let him go; show me where the drugs are --

2   further illustrates that Officer Brooks knew that he did not

3   have reasonable cause to get in that car.  He didn't know what

4   was in there ahead of time, and there's nothing that indicates

5   that he would know.

6          You have the cops walking around the outside of the car

7   with their flashlights, as testified to by Mr. Medrano.  There

8   were -- it's clear they were looking for a reason to get in that

9   car, and they couldn't find it.

10         Even Officer Brooks used DOC to use search the vehicle

11  based on what he knew, which wasn't enough.  DOC didn't have

12  enough information to search the vehicle either.  All they've

13  been told was he had a DWLS third suspension and a bench

14  warrant.  That doesn't really equal to getting into the car.

15         Neither officer could formulate any articulable facts as

16  to that car and what was in it.  Yes, there's a safe there, or

17  two safes.  They clearly misremembered what the safes looked

18  like, but they didn't know what was in those safes.  And then

19  you had Officer Taylor has admitted that he changed his

20  testimony and misled the Court on certain parts of his

21  testimony.

22         Further, there was no investigation as to the money by

23  Officer Brooks in terms of -- in terms of the Jeep itself.

24  There was no -- there was no understanding that there was a bill

25  of sale or where they got it.  He never even contacted where

1  they would have sold or bought that Jeep.

2       Without any facts, the officers just made assumptions.

3  They made assumptions based on prior -- other prior knowledge of

4  the area, they made their assumptions based on their training

5  and experience, not on what was actually happening in realtime.

6       Officer -- and as the Court saw, Officer Brooks played

7  fast and loose with the facts at certain points, especially when

8  it came to the safe.

9       Now, the analysis of reasonable cause is required here,

10 and the Government hasn't done that.  There hasn't been a

11 reasonable cause analysis for the totality of the circumstances

12 because they're only looking to one part, which is Mr. Medrano's

13 history, his criminal history.  They're looking to what the --

14 what the officers --

15      THE COURT:  Officer Taylor can take that into account,

16 his history.

17      MR. ZACHARY AYERS:  Yes, he can.  But they're not taking

18 into account the full facts.  They're -- they're skipping --

19 they're skipping steps in the totality analysis by not seeing --

20 knowing what's in the car.  Officer Taylor and Officer Brooks,

21 neither of them knew there was drugs or guns in that car.  Just

22 an assumption.

23      And what Mr. Medrano is asking is that the Court suppress

24 all the evidence post -- from that search, from the probationary

25 search and onward because there was no reasonable cause to

1  search the car and to -- and to arrest him based on any drug

2  charges, and any -- and because they're not supported by

3  reasonable suspicion or reasonable cause.  And all evidence

4  therefrom, flowing therefrom would be the fruit of the poisonous

5  tree at this point.

6          If the Court has any other questions of me or --

7          THE COURT:  I don't.

8          MR. ZACHARY AYERS:  Thank you, Your Honor.

9          THE COURT:  Ms. Baunsgard.

10         MS. BAUNSGARD:  Your Honor, as -- as the Court is well

11  aware, the issue before it is whether CCO Taylor had reasonable

12  cause to search the defendant's vehicle based on the facts known

13  to him, as well as reasonable inferences and deductions

14  therefrom and common sense, to include his training and

15  experience, as well as to include information he obtained from

16  Officer Brooks.

17         And I think it's important in this inquiry, and I feel

18  like we've delved into the weeds quite a bit in this evidentiary

19  hearing on an ad -- post hoc justifications after the fact,

20  which were not known to the law enforcement officer at the time.

21  And as the Supreme Court has recognized in the *Cortez* case, you

22  have to look at this question from the perspective of the

23  officer, because at the end of the day, we're coming back to a

24  Fourth Amendment analysis, and based on what the officer knew at

25  the time, was that officer's actions reasonable?  So we don't

 1  look at extraneous information unknown to the law enforcement

 2  officer.  It's simply not relevant under the case law.

 3       Further, the case law articulates that the inquiry is the

 4  totality of the circumstances known to the officer, not dividing

 5  out individual facts and trying to justify those facts or

 6  provide a potential innocent explanation for those facts.

 7       So -- and the Supreme Court reaffirmed that as well.

 8       So I think the roadmap for the Court is -- is clear in

 9  this case.  And I think it's also important to note that the

10  case law indicates that while there's objective factors which

11  could be deemed meaningless by people who are not trained law

12  enforcement professionals, still, those deductions from those

13  trained professionals are permissible deductions and can form

14  the basis for a totality of the circumstances determination of

15  reasonable cause.

16       So looking at this case from a law enforcement

17  perspective, as the Supreme Court has directed, we're talking

18  about Community Correction Officer Taylor, with his 11 years of

19  experience, his supervisor who had 18 years of experience, who

20  are presented with the facts of the case, and deemed they had

21  reasonable cause to search the defendant's vehicle, which is

22  defined as a well-founded suspicion.

23       As Officer Brooks and Officer Taylor both testified, the

24  vehicle was stopped at 29 South Thor, which is a designated hot

25  spot, high-crime area and a known drug area.  Officer Brooks

1   observed the movement of the vehicle hastily duck into the

2   alley, when his black, Interceptor, fully tinted car turned

3   mid-block on Mr. Medrano.  He contacted Mr. Medrano.

4   Mr. Medrano was driving suspended third.  He had a warrant for

5   his arrest, and he was on active DOC.

6        Officer Brooks testified that he does what he normally

7   does in that situation when someone is on DOC and calls the DOC

8   to see what they want to do for their supervisory interest in

9   this specific defendant.

10        He was able to articulate a large amount of currency

11   located on Mr. Medrano, which was specifically bundled, which

12   was of significance to him as a law enforcement officer, with

13   those rubber bands.

14        The DOC had independent knowledge of Mr. Medrano's recent

15   drug use, an admission to drug use seven days prior to the stop.

16   He was known by DOC to be unemployed for approximately the past

17   six months, and they had received an anonymous tip that

18   Mr. Medrano has been engaging in drug dealing.

19        There is additionally that issue of one day prior to the

20   stop of this woman who came to the DOC looking to serve

21   Mr. Medrano for some form of hit and run or some kind of action,

22   trying to serve him with some kind of legal process --

23        THE COURT:  Counsel, there is no testimony that this was

24   a hit and run, was there?

25        MS. BAUNSGARD:  I do believe Officer Taylor testified

1  that based on his reading of the entry into that log, that it

2  was implied it was a hit and run.  That's why I said it might be

3  a hit and run.  But there's some form of suspicion, some form of

4  issue, certainly, of a woman coming in, trying so serve

5  Mr. Medrano with some legal process.  That was very clear to

6  Officer Taylor.  He was less clear on the hit and run.

7        THE COURT:  Okay.

8        MS. BAUNSGARD:  Additionally, Officer Brooks and Officer

9  Taylor both testified to a change in demeanor by Mr. Medrano

10 when DOC arrived at the scene; Mr. Medrano was yelling.  They

11 couldn't tell what he was yelling.  But -- and Officer Taylor

12 stated, based on his knowledge and personal interaction with

13 Mr. Medrano as a supervising officer and knowing him with DOC,

14 that was certainly out-of-character behavior for Mr. Medrano,

15 which caused him concern.

16       Additionally, Mr. Medrano did not have a stable residence

17 that he was living at, and he had -- well, he and his girlfriend

18 were both involved in controlled substance use.

19       As to the defendant's testimony, I would note that based

20 on the case law, he had testified to mostly irrelevant facts,

21 but even to the potentially relevant facts he testified to, I

22 would submit to the Court that his testimony is not entitled to

23 much weight.  As outlined yesterday in his cross-examination,

24 he's a multiple-time convicted felon; he has multiple controlled

25 substance convictions; and, additionally, he's been on, and

1  significantly, I think, he's been on community supervision many

2  times before for lengthy periods of time.  This is not his first

3  rodeo.  He knows what to do and what to say to try to avoid

4  detection.  And he testified that he lied to Officer Brooks

5  twice during the contact to avoid potentially DOC coming to

6  search him.  He has to have a full understanding of what DOC was

7  going to do when they got there, and that's why he was

8  attempting DOC from getting there by say, no, I'm not on DOC; I

9  terminated DOC a couple months prior.  So he was attempting to

10 divert attention from the DOC search.

11        Further, I would say his testimony is not entitled to

12 much weight, as he and -- both he and his girlfriend, I should

13 say both, their testimony is not entitled to much weight because

14 they're both controlled substance users, which can impair

15 recollection.

16        And further I would note, was something I took of note,

17 was Mr. Medrano was attempting to justify the money he

18 anticipated Officer Brooks would find on his person before

19 Officer Brooks even found it on his person.  That's my

20 recollection of the testimony is he by himself said, oh, I got

21 that from selling my car.  And that was not in response to a

22 question by Officer Brooks; that was a spontaneous statement by

23 this defendant before the money was located.

24        So I would say -- and also I just wanted to address

25 Ms. cannon's testimony briefly.  We put Officer Brooks on the

1  stand yesterday in rebuttal, and he specifically denied the

2  assertions that Ms. Cannon stated, that he said he was going to

3  arrest her if she didn't show him where the drugs were, and I

4  would say that is not -- Ms. Cannon is not a credible witness in

5  this file.

6          End of the day, though, if we step back and look at the

7  inquiry we're -- we're assigned to here, we have two law

8  enforcement officers who testified as to these facts and

9  circumstances that were known to them at the time.  So if we

10 take all these factors together and we draw inferences to them,

11 we look at the officer's training and experience, we draw on our

12 common sense and understanding, I do believe that there is

13 reasonable cause, and they had reasonable cause to conduct this

14 search.  And that reasonable cause triggers the search

15 conditions of Mr. Medrano's person, vehicle, or residence.  And

16 that's what they did here.  They searched his vehicle, and they

17 found a bunch of evidence of controlled substance trafficking,

18 as well as firearms.

19         So I would submit to the Court that under the case law

20 that I have articulated in the memoranda that it is reasonable

21 under the Fourth Amendment, and the Court should not suppress

22 that evidence.

23         Did the Court have any further inquiry?

24         THE COURT:  I don't.  Thank you.

25         MS. BAUNSGARD:  Thank you.

1          THE COURT:  After hearing the evidence in this case and

2    the arguments presented by the parties, the Court is prepared to

3    rule from the bench.

4          As I indicated yesterday at the outset, the Supreme Court

5    has decided in *United States v. Knight* and has made it very

6    clear that I don't need to determine whether or not Officer

7    Taylor was facilitating a police investigation as opposed to him

8    conducting his own probationary search.  He's entitled to do

9    that, Officer Taylor is.  Because the search at issue was

10   conducted by a probation officer and Medrano was subject to the

11   search conditions, the search did not need to be supported by

12   probable cause to comply with the Fourth Amendment.  Instead,

13   Officer Taylor need only have reasonable suspicion that

14   Mr. Medrano was engaged in criminal activity.

15         Additionally, under state law, the search was authorized

16   if Officer Taylor had reasonable cause to believe that Medrano

17   violated the conditions or requirements of his sentence.

18         And so that's the backdrop that we have.  The

19   constitutional and state law questions are functionally the

20   same:  Was it reasonable for Officer Taylor to search the

21   vehicle based upon the information that he had at that time.

22         You know, and of note, I mean, the institutions of

23   justice, certainly the Court, depend upon the credibility of the

24   witnesses who testify before it.  It's -- it's even more

25   important in cases such as these where the Court really relies

1   on the testimony, again, of lay witnesses and certainly of

2   officers.  Even officers of the Court, when they come to this

3   Court, as Ms. Baunsgard did, and come forward and say, "Judge,

4   this person needs an attorney," you don't know how happy that

5   makes me, that people are concerned about the rights of

6   individuals; that it is important to be honest; that it is

7   important to be forthright.  Which makes it even more difficult

8   about what happened yesterday.

9        I want to go through Officer Taylor's testimony as

10  supporting the reasons that he believed he had the right to

11  search this vehicle.

12       He testified that Medrano had a large sum of cash in his

13  pocket, which Officer Taylor explained was unusual, given the

14  fact that he was unemployed and didn't have housing.  And then

15  he said that, oh, this was consistent with drug trafficking,

16  and -- oh, his history of drug trafficking, is what his

17  testimony was.  When pressed upon that, he was then

18  equivocating.  There is no evidence that Mr. Medrano had a

19  history of drug trafficking.  None.  There was a question by

20  Ms. Baunsgard:  Isn't it true that in Idaho you were charged

21  with this?  The answer was "no."

22       Was I then given a document from Idaho indicating that,

23  in fact, he had been charged with it?  No, I was not.  Instead,

24  there was just merely an accusation that was rebutted by actual

25  testimony by Mr. Medrano, who indicated that he did not have any

Case 2:17-cr-00067-SMJ   ECF No. 52   filed 09/11/17   PageID.422   Page 32 of 44

            Contested Motion Hearing- Volume II/September 6, 2017
                           The Court's Ruling

 1  convictions.  I'm sure if there had been convictions, I'm sure

 2  if there had been a charge, I would have been provided that.

 3  That didn't happen.

 4          Instead, what Officer Taylor did was, again, begin to

 5  mislead this Court and give the Court the wrong impression.  And

 6  that was offensive.

 7          The fact that he had a large amount of money is also one

 8  of those facts that, you know, in the abstract you'd think, wow,

 9  this guy had -- in the end it turns out he had 3,400, $500 in

10  his pocket.  When I read the briefs I was thinking, oh, wow.  I

11  didn't even understand why we were even having a hearing,

12  frankly, after just reading the briefing in this case.

13          Well, it turns out that Officer Taylor did not know how

14  much money Mr. Medrano had in his pocket.  All he knew was it

15  was a large wad of money that was wrapped in a rubber band.

16  That could have been $400, could have been $200, could have been

17  a thousand, and it could have been $3,500, as it was in this

18  case.  But the fact is he didn't know because Officer Brooks

19  never told him.

20          Then we get to the testimony about the safe being in the

21  front seat.  Now, the first time both Officer Brooks and Officer

22  Taylor testified they said, oh, there's this safe that's in the

23  front seat.  Again, reading the briefs, I'm thinking:  Why are

24  we here?

25          Well, what both Officer Brooks and Officer Taylor didn't

                    KIMBERLY J. ALLEN, CRR, RPR, CSR
                         OFFICIAL COURT REPORTER

1   say in their opening testimony was the fact that this safe was

2   in a cardboard box with the sticker still on it, having just

3   been bought at a store.

4         Now, is that unusual?  I don't think so.  People who buy

5   things sometimes carry them in the front seat, still in their

6   packaging.

7         But the way in which Officer Taylor testified and Officer

8   Brooks finished their testimony, left, didn't once mentioning

9   that, in fact, this box -- this safe was in the box.  Instead,

10  they testified, specifically Officer Taylor, that he brought out

11  the safe, opened it up, and had guns and drugs in it; opened it

12  up and showed that to Officer Brooks, again, leaving the Court

13  with a misimpression that, in fact, this was the same safe,

14  never mentioning the fact that there was a second safe that was

15  hidden behind the front passenger seat.

16        And who did I learn this from?  Who did I learn this

17  valuable piece of information that cleared up what happened?

18  Mr. Medrano, who testified; again, questioning the credibility

19  of these witnesses.

20        Then there's testimony by Officer Taylor, again, another

21  basis for the fact that this establishes reasonable cause, the

22  fact that Mr. Medrano, in fact, had tested positive for

23  controlled substances a week prior.  And he testified that he

24  was ordered to do, I want to say work crew; he testified that he

25  had to do some work crew.  First, he never mentioned the fact

1   that he had two weeks left on his probation; didn't say that

2   probation was extended; didn't say that, in fact, the morning of

3   this arrest, Mr. Medrano had been in the DOC office that morning

4   doing orientation for those work crew hours.  Didn't say that

5   one bit.  Says later on, when we're calling him back, that he

6   just simply didn't know that.  Yet his testimony was that he

7   was -- whenever he testified about something about Mr. Medrano,

8   he says, no, I reviewed the log; I reviewed the log; I had that

9   information.  Again, I have a question about Mr. Taylor's

10   recollection here.

11          Again, reading the briefs, I had been told that the

12   area -- and there was testimony about where the area that

13   Mr. Medrano was.  Nowhere in the briefs did it indicate what

14   time of day this was; that this was a hot spot, an area that

15   there was drug trafficking.  You know, in abstract that would

16   be, again, an important factor.  Nowhere in the briefing did

17   they tell me what time this had occurred.  The witnesses didn't

18   testify about that.

19          It was only after I asked Ms. Baunsgard to ask the

20   witnesses to provide the chronology and time did they, in fact,

21   admit that this was happening at 9 o'clock in the morning.  Not

22   at 1 o'clock at night in a high drug-trafficking area.  Again,

23   the Court is getting the impression that I'm being misled by

24   these witnesses.

25          The fact that when Officer Brooks testified that he saw

1   that Mr. Medrano was driving a vehicle that didn't have a

2   license plate, he properly had a right to stop that vehicle.  He

3   turns around and immediately stops the vehicle -- excuse me,

4   turns around and approaches the vehicle.  The vehicle was

5   already stopped.  The vehicle had been parked in an alley, at

6   9 o'clock in the morning.

7        Officer Brooks was not driving a vehicle -- did not turn

8   on his lights and sirens.  But Officer Brooks didn't testify

9   about that until I had to ask, did you turn on your lights and

10  sirens?  Until I had to ask, were you driving a vehicle that was

11  marked as a patrol vehicle?  Because the impression of the

12  previous testimony was that Mr. Medrano was somehow trying to

13  abscond after being pursued by a police officer, and that was

14  clearly not the case.

15       There was testimony about Mr. Medrano from an anonymous

16  source that was provided to Mr. Taylor that he was dealing in

17  narcotics.  Again, this is an unnamed source.  There was no

18  details provided.  There were no ability for the Court to

19  believe that that information was, in fact, reliable.  In fact,

20  Mr. Taylor, Officer Taylor did not testify about whether or not

21  that information was reliable.  The Court does not find that

22  that has very much weight.

23       There was no testimony by Officer Taylor -- excuse me,

24  Officer Brooks that Ms. Taylor [sic], when she approached was,

25  in fact, driving also on a suspended license.  It was only after

 1  Ms. Cannon -- I don't know if I said that correctly.  Ms. Cannon

 2  driving under a suspended license.  It was only after she

 3  testified.  And then she also testified about Officer Brooks

 4  threatening to have her arrested if she didn't move back.

 5  Again, I don't know if that's true or not, but that was the

 6  testimony.

 7          So, in the end, what do we have?  We have Mr. Medrano

 8  driving at 9 o'clock in the morning going over to a friend's

 9  house; driving while license suspended; out of his vehicle;

10  walking towards the officer who rolls down his window;

11  recognizes him, that he's an officer; provides him his

12  information; he's arrested for driving while license suspended.

13  Inside of this vehicle what you can see from the outside is, in

14  fact, a cardboard box that's surrounding a safe, with its

15  packaging in it, with its stickers, according to the testimony,

16  still on it; with Mr. Medrano having -- with Mr. Medrano having

17  a large amount of money in his pocket; unemployed.

18          And it comes down to the credibility of the witnesses.

19  And I simply do not find Officer Taylor's testimony credible,

20  based upon some of his demeanor, but mainly his contradictory

21  testimony and the need to shade the truth.  You're not going to

22  come into my courtroom and provide half truths, because aside

23  from everything, you are officers who are swearing an oath when

24  you sit down in that chair, and you are telling me that you're

25  going to tell me the truth.  And you try to mislead?  That was

1  offensive.  That has never happened to me as a practicing

2  lawyer, and it never happened to me as a judge.

3        The Court's going to grant the motion to suppress,

4  including the fruits.

5        Now, do I believe for a minute that that money was from

6  the sale of a car or from financial aid?  No.

7        Were there credibility problems?  Sure, on Mr. Medrano's

8  side.  Yeah.

9        But the problem here is that the people that I expect to

10  be telling me the truth misled the Court.  And it was only

11  Mr. Medrano who, in fact, actually provided truthful information

12  that was corroborated.

13        So considering the totality of the circumstances, the

14  Court does not believe that there was a reasonable basis to

15  search this vehicle.  As such, again, the Court will be

16  suppressing that.

17        I should also note that there will be a written order

18  detailing the Court's reasoning to supplement today's oral

19  ruling.

20        Thank you.  I believe that -- are there any other matters

21  we need to address?

22        MR. WALTER AYERS:  Yes, just one, Your Honor.

23        THE COURT:  Yes.

24        MR. WALTER AYERS:  And probably --

25        THE REPORTER:  I can't hear you.

1        MR. WALTER AYERS:  Yes, there is one, but probably you

2   will send this to the magistrate judge.  I would move that,

3   based on the Court's ruling, there's no evidence that the

4   Government can put into evidence now.  I would, A, move to

5   dismiss the case; and, B, have Mr. Medrano released immediately.

6        THE COURT:  Ms. Baunsgard?

7        MS. BAUNSGARD:  I would respectfully submit to the Court

8   that that is not accurate.  We do have cooperating defendants

9   who are prepared to testify about the conspiracy that

10  Mr. Medrano was in, where they articulate the fact that he was

11  moving between one to five pounds every other day of

12  methamphetamine into our community.  So I would object to the

13  defense's motion on this case.

14       THE COURT:  Okay.

15       MR. WALTER AYERS:  I have one additional motion.  I have

16  a motion now for discovery.  That has never been provided to the

17  defense, that there's been any cooperating witnesses in this

18  case whatsoever until she just brought it before the Court's

19  attention.  This is a -- this case is appalling.  The handling

20  of this case from square one, I have to agree with the Court, in

21  35 years of experience as a prosecutor and as a defense

22  attorney, I've never seen one handled this appallingly.

23       I want the discovery, and I would ask the Court to enter

24  an order that she give that discovery; hand it over immediately.

25       THE COURT:  Ms. Baunsgard, there's some discovery that

1  you have that -- relating to some witnesses?

2        MS. BAUNSGARD:  I do have discovery, Your Honor, but I

3  would very much object to Mr. Ayers' characterization of this

4  case from the get-go.  That is not accurate at all.  I have had

5  three separate discussions with Mr. Ayers about the cooperating

6  defendants and what their proposed testimony is going to be.

7        It is -- it is correct that I have not provided the

8  reports based on this case.  As Mr. Medrano testified, we were

9  in a free-talk posture.  He came in, and he talked to the

10 Government two separate times --

11       MR. WALTER AYERS:  Your Honor, I'm going to ask that this

12 hearing be closed at this time.

13       THE COURT:  Counsel, hold on.  Hold on.  Hold on.  Hold

14 on.  If we're going to be talking about sensitive information,

15 it makes sense that we close this hearing.

16       MS. BAUNSGARD:  I will discontinue talking about that,

17 and I apologize.  I want -- the point I was making to the Court

18 was we were not in a litigation posture, so I did not have all

19 of my discovery out, in terms of trial discovery; that's

20 cooperating defendants for trial.

21       I am happy to go to my office, do the appropriate

22 redactions, and provide that to defense today.

23       MR. WALTER AYERS:  Your Honor, it doesn't make any

24 difference if we're in cooperating or litigating posture.  That

25 information should have been turned over early on in accordance

1  with the Court rules.  And this is appalling to me.  This is --

2  this is purely straight out, looks like a *Brady* violation to me.

3  It doesn't make any difference whether he's cooperating or not.

4  That's discovery.  That discovery -- that type of discovery

5  provided early on may affect Mr. Medrano's decision, regardless

6  of what he decides to do in a case like this.  We never got the

7  discovery.  Cooperating -- she's known for some time that he

8  wasn't in a cooperating posture.  She knew from the day this

9  motion was filed he wasn't in a cooperating posture.

10      So those conversations included her and I, and I have no

11  qualms about stating those to the Court at any point in time.

12  But I am appalled.  I want the discovery.  And now we've got a

13  situation where she's threatened to file an 851 -- 851s on this

14  man, but hasn't provided full discovery.  This is appalling.

15  This kind of threat is appalling.  I am offended that -- as a

16  former prosecutor, I am offended.

17      I have nothing more to say, Your Honor.  I apologize.

18      THE COURT:  Ms. Baunsgard, anything else?

19      MS. BAUNSGARD:  I would.

20      Thank you, Your Honor.  It's no one's purpose to

21  disparage anybody else in front of the Court.  That's not, as

22  officers of the Court, what we do.  I would advise the Court

23  that -- I really don't need to get into the details in hashing

24  this, but I'm extremely offended by the statements defense

25  counsel has made, and I can represent to you as an officer of

1   the court, that that is not correct.

2        I can advise the Court that the conversation I had with

3   defense counsel was Mr. Medrano was going to plead guilty.  If

4   he wasn't going to plead guilty, he was going to move -- move my

5   response to the motion out; he was going to move the trial out.

6        3:30 p.m. on the day that my response to his motion to

7   suppress was due he called me and said he will not agree to move

8   the responsive briefing out; he will not agree to move the

9   trial; he wants to go forward.

10       So in a span of six hours, I got the response to the

11  motion to suppress filed, I had to talk to the witnesses, and

12  got it all ready to go based on his representations.  So I take

13  great offense at his representation that I've known for some

14  time that this is not going to be a cooperative posture.  Even

15  yesterday morning Mr. Ayers came down and was proffering

16  information this defendant would tell me in subsequent free

17  talks.  So sitting up here and saying that he was not in a

18  cooperative posture is very difficult to hear.

19       And, additionally, *Brady* violations, *Brady* is exculpatory

20  material -- not inculpatory -- exculpatory material, and I can

21  advise this Court that none of the cooperating defendants has

22  provided exculpatory material as to Mr. Medrano.  So I do take

23  offense to his representation of a *Brady* violation.

24       I would be happy to reduce these comments to writing as a

25  motion to the Court, if the Court would prefer.  But as I've

1  indicated, I will go downstairs, I will do the appropriate

2  redaction for the cooperator statements, and I'm happy to

3  provide them to Mr. Ayers.

4         THE COURT:  Okay.

5         MS. BAUNSGARD:  Does the Court have any further inquiry?

6  I'm happy to discuss further.

7         THE COURT:  No.  I think I understand.  Thank you.

8         MS. BAUNSGARD:  Thank you.

9         THE COURT:  Well, you know, first of all, I think -- and

10 Ms. Baunsgard indicates she's going to do this.  I fully expect

11 her to, in fact, provide that additional discovery to Mr. Ayers,

12 and if there's a *Brady* violation, I'm sure there's going to be a

13 motion, and I would expect that to be in writing, and -- and the

14 Court will deal with that at the appropriate time.

15        And so I would expect Ms. Baunsgard to provide that

16 information today, if possible.

17        With regards to the motion to release, I just simply

18 don't know what all the evidence is in this case.  I don't know

19 what is or is not going on in this case.  So -- but I typically

20 leave the issues of detention to the magistrate judge, and

21 that's what I'm going to do in this case.  I'm going to refer

22 this matter to Magistrate Rodgers for his evaluation and his

23 determination.

24        And I don't know how soon you can get in front of

25 Magistrate Rodgers, but that's -- that's what I'm going to do.

1          So -- and, again, if there's a motion regarding any

2    violations or if there's additional charges, I guess we'll deal

3    with that when it comes.

4          All right.  Thank you again for your presentations both

5    today and yesterday.  And we'll take a brief recess before we

6    get started on our next matter.

7          THE COURTROOM DEPUTY:  Please rise.

8          Court is in recess.

9          (Hearing concluded at: 9:22 a.m..)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3       I, KIMBERLY J. ALLEN, do hereby certify:

4            That I am an Official Court Reporter for the United

5    States District Court for the Eastern District of Washington in

6    Richland, Washington;

7            That the foregoing proceedings were taken on the date

8    and at the time and place as shown on the first page hereto; and

9            That the foregoing proceedings are a full, true and

10   accurate transcription of the requested proceedings, duly

11   transcribed by me or under my direction.

12           I do further certify that I am not a relative of,

13   employee of, or counsel for any of said parties, or otherwise

14   interested in the event of said proceedings.

15           DATED this 11th day of September, 2017.

16

17

18           */s/ Kimberly J. Allen*

19           Kimberly J. Allen, CRR, RMR, RPR, CCR
             Washington CCR No. 2758
20           Official Court Reporter
             Richland, Washington

21

22

23

24

25