FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Sep 20, 2017

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CARLOS TORRES MEDRANO, JR.,<br><br>Defendant. | No.   2:17-CR-0067-SMJ<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE** |

On September 12, 2017, the Court held a hearing on Defendant Carlos Torres Medrano Jr.'s Motion to Suppress, ECF No. 34. The Court granted the motion at the conclusion of the hearing. This order memorializes and supplements the Court's oral decision.

## I.    INTRODUCTION

On March 28, 2017, Spokane Police Officer Winston Brooks stopped Defendant Carlos Medrano, Jr., for driving a vehicle without proper license plates and subsequently arrested Mr. Medrano for driving with a suspended license. Officer Brooks searched Mr. Medrano's person and found a roll of cash in one pocket. Officer Brooks did not enter Mr. Medrano's vehicle, but testified that he could see a safe sitting on the front passenger seat. Because Mr. Medrano was on

ORDER GRANTING
MOTION TO SUPRESS - 1

active supervision with the Washington Department of Corrections (DOC),

Officer Brooks contacted DOC, and Community Corrections Officer (CCO)

Jeremy Taylor came to the scene and searched Mr. Medrano's vehicle. Officer

Taylor found guns, narcotics, and other drug-trafficking related items in a safe

located in the vehicle.

Mr. Medrano seeks to suppress the evidence obtained as a result of Officer

Taylor's search. Mr. Medrano argues the search violated the Fourth Amendment

because Officer Taylor acted as a "stalking horse" to facilitate a warrantless

investigatory search by law enforcement. Following the Supreme Court's decision

in *United States v. Knights*, 534 U.S. 112 (2001), the stalking-horse doctrine is no

longer good law. There is no basis to distinguish between probationary and

investigatory searches conducted by probation officers for Fourth Amendment

purposes. *Id.* at 116. Instead, whether Officer Taylor lawfully searched Mr.

Medrano's vehicle turns on whether he had reasonable cause to believe that Mr.

Medrano was violating a term or condition of his sentence and that he would find

evidence of the violating conduct in the vehicle. *See* Wash. Rev. Code (RCW) §

9.94A.631; *State v. Livingston*, 389 P.3d 753, 756–57 (Wash. App. 2017).

While Officer Taylor had reasonable cause to believe Mr. Medrano was

violating the terms of his probation by driving with a suspended license, he did not

have reasonable cause to believe he would find evidence of the violation in Mr.

ORDER GRANTING
MOTION TO SUPRESS - 2

Medrano's vehicle. Officer Taylor also did not have reasonable cause to believe Mr. Medrano committed any other violation that would justify searching the vehicle. Importantly, he did not know that Mr. Medrano was carrying an unusually large amount of money, the safe visible in the front seat of the car was in its retail packaging, and Mr. Medrano was in compliance with his DOC supervision. Accordingly, Mr. Medrano's motion to suppress is granted.

## II.    BACKGROUND

On March 28, 2017, around 9:30 a.m.,[1] Officer Brooks of the Spokane Police Department was on patrol in the area of 29 South Thor Street in Spokane. As Officer Brooks was driving westbound he observed a white Cadillac with no front license plates heading eastbound. As the vehicle passed, Officer Brooks observed that it also had no rear license plates, but it did have a paper dealership tag. Officer Brooks made a U-turn, intending to stop the vehicle. Officer Brooks followed the vehicle as it made a left turn into the alley behind 29 South Thor.[2]

---

[1] Neither the Government in its briefing, nor Officer Brooks in his testimony, stated the time of day that this incident occurred. It was only after the Court asked to have Officer Brooks explain the time of day and chronology of events that the Court learned the incident occurred in the morning not at night. The argument and evidence presented before that point gave the Court the misimpression that the incident occurred at night in a high crime area.

[2] Officer Brooks characterized the vehicle's turn into the alley as "quite hasty" and testified that he thought it was "to probably avoid detection." But no evidence suggests that the vehicle's driver was attempting to avoid detection by turning into the alley. In his initial testimony Officer Brooks omitted the important fact that he was driving an unmarked police car and that he never turned on his lights or siren.

ORDER GRANTING
MOTION TO SUPRESS - 3

1    Officer Brooks testified that as he pulled into the alley, he saw a male

2   walking "away." After the Court pressed Officer Brooks on exactly where the car

3   parked and the direction the driver was going, it became apparent that a male—

4   later identified as Mr. Medrano—exited the driver's seat and walked southbound

5   away from the car and *towards* Officer Brooks' vehicle and the 29 South Thor

6   residence.[3] As Officer Brooks approached, Mr. Medrano was using his cell phone

7   to call his girlfriend, Brittany Cannon. Officer Brooks remembers Mr. Medrano

8   saying to her: "Hey, I just got pulled over here by 29th and Thor," and "come over

9   here." Officer Brooks, who was still seated in his patrol vehicle with the window

10  down,[4] asked Mr. Medrano to stop and approach the vehicle. Mr. Medrano

11  complied. Officer Brooks asked Mr. Medrano for his name. Mr. Medrano

12

13  _____

    Mr. Medrano, who acknowledges he was driving the vehicle, testified that he did
14  not know he was being followed by a police officer. This testimony is supported
    by the fact that Officer Brook's patrol car was unmarked and Officer Brooks
15  never turned on his lights or sirens, and it is not disputed that 29 South Thor was
    Mr. Medrano's intended destination.

16  [3] This, again, is a critical omission. Officer Brooks's initial testimony (and the
    Government's briefing) created the impression that Mr. Medrano was attempting to
17  evade Officer Brooks, when, in fact, there was no evidence to support that Mr.
    Medrano attempted to evade. These omissions raise serious questions about the
18  reliability of Officer Brooks's testimony.

19  [4] Officer Brooks initially testified that he exited his vehicle before asking Mr.
    Medrano to stop. Subsequent testimony from Officer Brooks and Mr. Medrano
20  made clear that, in fact, the initial contact was made while Officer Brooks was still
    in his patrol car.

ORDER GRANTING
MOTION TO SUPRESS - 4

responded by asking what he did and whether he was legally obligated to provide his name. Officer Brooks explained that he didn't have a license plate on the vehicle, and again asked Mr. Medrano for his name. Mr. Medrano testified that he was concerned that if he did not answer, he might be arrested "for obstruction." Mr. Medrano then responded that he did not have any identification, but he provided his name and birth date.

Officer Brooks remembered Mr. Medrano saying he was going to meet his girlfriend at McDonalds and that he was coming from the valley. Officer Brooks explained that the direction Mr. Medrano was traveling was inconsistent with coming from the valley, which aroused his suspicion. In fact, Medrano had been at the Department of Corrections Office on Sprague Avenue immediately preceding the stop for an orientation, and he testified that he traveled from that location to 29 South Thor, and was then going to meet Ms. Cannon. This testimony is uncontradicted and is consistent with Mr. Medrano's direction of travel when he turned into the alley behind 29 South Thor. Mr. Medrano testified that he thought he told Officer Brooks that he lived in the valley, not that he was coming from the valley.

Officer Brooks checked Mr. Medrano's name through dispatch and was informed Mr. Medrano had an outstanding arrest warrant for driving with a

ORDER GRANTING
MOTION TO SUPRESS - 5

suspended license and he was under active Washington DOC supervision. Officer

Brooks decided to arrest Mr. Medrano and waited for a backup officer to arrive.

When a backup officer arrived, Officer Brooks placed Mr. Medrano under

arrest. Officer Brooks then conducted a search of Mr. Medrano's person. Officer

Brooks found several loose bills in different denominations in one of Mr.

Medrano's pockets, and in another pocket he found a "bundle of cash in different

denominations wrapped in two black rubber bands." Officer Brooks believed,

based on his experience and training, that the bundle of cash appeared consistent

with drug trafficking. Officer Brooks did not initially testify to the amount of cash

in the bundle. When asked the amount by the Court, Officer Brooks

acknowledged he did not count the money at the scene.[5] Officer Brooks did not

find any drugs or guns on Mr. Medrano's person. Mr. Medrano testified that he

told Officer Brooks the money was Ms. Cannon's and asked him to release the

money to her.

While Officer Brooks was placing Mr. Medrano under arrest, or just

slightly before that time, Ms. Cannon arrived in a different vehicle. According to

Officer Brooks, Mr. Medrano said to her: "Hey, I have the money for the car I just

sold for you."

---

[5] The amount was later determined to be $3,273.00.

ORDER GRANTING
MOTION TO SUPRESS - 6

After placing Mr. Medrano in the patrol car, Officer Brooks visually inspected the vehicle Mr. Medrano had been driving. Officer Brooks initially testified that he looked into the vehicle and "saw on the passenger seat a safe."[6] He said that this, in connection with the large amount of cash on Mr. Medrano, piqued his interest. Mr. Medrano testified that around this time a third officer arrived and looked into the vehicle and then started walking away after shaking his head at Officer Brooks and the second officer at the scene.

After looking in the vehicle, Officer Brooks spoke with Ms. Cannon. She states that Officer Brooks asked her for her identification and why she was there. She gave him her identification and told him she came because Mr. Medrano called her. Ms. Cannon testified that as Officer Brooks was walking back to his car with her identification, she said: "Can I please get the money that he had on him? It was mine." Officer Brooks responded by asking: "Why does he have your money?" And she said: "Because me and him are having a baby together, we're in a relationship, and we just recently got kicked out of our apartment, so we're looking for a new place to live. And he has some of my financial aid money, because we're both searching for apartments and putting in applications." She also explained that some of the money came from selling a Jeep that belonged to her.

---

[6] Officer Brooks omitted the important fact that this safe was still in its retail packaging.

ORDER GRANTING
MOTION TO SUPRESS - 7

Officer Brooks looked Ms. Cannon up and then told her that her license was suspended. Ms. Cannon testified that Officer Brooks told her to stay at her vehicle or he would arrest her for driving with a suspended license.

Next, Officer Brooks contacted the DOC, which he stated was his practice whenever he arrested an individual on supervision. He spoke to CCO Jeremy Taylor.[7] Officer Brooks told Officer Taylor that he had Mr. Medrano under arrest for driving with a suspended license and that Mr. Medrano had a large sum of money.[8] He asked if Officer Taylor wanted to come and check in. Officer Brooks initially stated that he did not speak about the vehicle during this call, but he subsequently clarified that he did say something to the effect of "I'm interested what's in the car." Officer Taylor told Officer Brooks to stand by while Officer Taylor contacted his supervisor.

After speaking with Officer Taylor, Officer Brooks again spoke to Ms. Cannon. Officer Brooks testified that Ms. Cannon told him Mr. Medrano did not have a job and was on assistance, and that he had just sold a car a day or two earlier. Ms. Cannon described the conversation as more extensive. She stated that

---

[7] Officer Taylor previously supervised Mr. Medrano for a period of about six months, but he was not Mr. Medrano's current CCO. Officer Taylor responded to the call because Mr. Medrano's CCO at the time was out.

[8] Officer Brooks again omitted that he did not know the actual amount of money, leaving the Court with the initial misimpression that he had conveyed some an amount or estimation of an amount to Officer Taylor.

ORDER GRANTING
MOTION TO SUPRESS - 8

Officer Brooks asked her if there were drugs in the car and said that she was a smart girl and didn't want to get into anything that could get her in trouble. She testified that Officer Brooks said "just show me where the drugs are in the car, and I will let him go." Ms. Cannon further testified that when Officer Brooks asked her again about the money, she explained again that they were in a relationship and looking for housing. Ms. Cannon declined to offer further explanation, stating: "I don't want to say anything else because I don't know what's going on."

About five minutes after he first spoke to Officer Brooks, Officer Taylor called Officer Brooks back and said he would be coming to the scene. Officer Taylor arrived with another CCO five or ten minutes after this call.

Officer Brooks testified that when Officer Taylor arrived, Mr. Medrano was "screaming in the back of the car . . . trying to get someone's attention." Officer Taylor similarly testified that when he pulled up he could hear Mr. Medrano screaming loudly, which was out of character because "[n]ormally he's a fairly calm, respectful person."  Mr. Medrano testified that he was yelling "that's not my vehicle," and that he was trying to ask where his assigned CCO was.

Officer Brooks gave Officer Taylor the keys to Mr. Medrano's car, and Officer Taylor immediately went to search the vehicle. Officer Taylor first looked in the window and, like Officer Brooks, said he saw a safe sitting on the front seat. He added additional detail: "in the front passenger seat, uh, was . . . a rectangular,

ORDER GRANTING
MOTION TO SUPRESS - 9

gray-style safe." Officer Taylor explained that from his experience and training he "always discerned those to contain some sort of . . . either narcotic or firearm."[9] After opening the vehicle, Officer Taylor testified that the other CCO assisting him "pulled the safe out" and handed it to him. Officer Taylor "[f]elt the safe; it was definitely heavy; out of sorts." He "opened it up, noticed there was a firearm, what [he] believed to be narcotics, [and] a scale." Officer Brooks did not assist Officer Taylor with the search.

Officer Brooks testified that Officer Taylor informed him that the "safe that we saw in the passenger seat had, um, two handguns and narcotics and a scale." Officer Taylor similarly testified that he "opened the safe" and showed the contents to the Spokane Police Officers. After being advised of what Officer Taylor found in the car, Officer Brooks said he would take the evidence for state charges and applied for a warrant for the remainder of the vehicle.

Mr. Medrano testified that the safe on the front seat was brand new; still in its box from Walmart, where he says he bought it the night before; and empty. Mr. Medrano stated the evidence Officer Taylor found was in a second safe on the floor under the passenger seat covered by clothes.

---

[9] Like Officer Brooks, Officer Taylor omitted that the safe on the front seat was still in its retail packaging.

ORDER GRANTING
MOTION TO SUPRESS - 10

Neither Officer Taylor nor Officer Brooks had previously testified to the fact that the safe in the front seat was in a box within its retail packaging or that there were two safes in the vehicle. Confronted with Mr. Medrano's testimony, Officer Taylor and Officer Brooks both acknowledged that the safe in the front seat was in a cardboard box and that there were two safes in the car. Officer Taylor also acknowledged that it was the second safe, which Officer Taylor found in the back under the passenger seat, that contained firearms, narcotics, and a scale.

## III.    DISCUSSION

Medrano argues that (1) Officer Brooks did not have probable cause to search the vehicle; (2) Officer Taylor's search lacked probable cause and was therefore an illegal "stalking horse" search in violation of the Fourth Amendment; and (3) all of the evidence in this case was obtained as a result of an unlawful search and must therefore be suppressed. ECF No. 34. In its response, the Government does not address Medrano's first or third argument. Indeed, it is clear to the Court that Officer Brooks lacked probable cause to search the vehicle, and suppression of evidence obtained from the vehicle search will require suppression of all evidence subsequently seized as a direct or indirect result of that search, *see Wong Sun v. United States*, 371 U.S. 471, 484–87 (1963). Instead, the Government argues the stalking-horse doctrine is no longer good law and that, even under that standard,

ORDER GRANTING
MOTION TO SUPRESS - 11

1    Officer Taylor's search of the vehicle was permissible. The Government is correct

2    that the stalking-horse doctrine is no longer good law. Accordingly, the factual

3    question before the Court is whether Officer Taylor's vehicle search was supported

4    by reasonable cause. As discussed below, it was not.

5    **A.    The Court must evaluate the lawfulness of Officer Taylor's search under Washington's reasonable-cause standard.**

6    

7    Warrantless searches "are *per se* unreasonable under the Fourth

8    Amendment—subject only to a few specifically established and well-delineated

9    exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United*

10    *States*, 389 U.S. 347, 357 (1967)) (quotation marks omitted). One such exception is

11    a warrantless search of a defendant authorized by probation conditions and

12    supported by reasonable suspicion. *United States v. Knights*, 534 U.S. 112, 121

13    (2001). "The degree of individualized suspicion required of a search is a

14    determination of when there is a sufficiently high probability that criminal conduct

15    is occurring to make the intrusion on the individual's privacy interest reasonable."

16    *Id.*

17    Mr. Medrano was subject to Washington's standard probationary-search

18    provision, under which a DOC officer "may require an offender to submit to a search

19    and seizure of the offender's person, residence, automobile, or other personal

20    property," if the officer has "reasonable cause to believe that [the] offender has

violated a condition of the requirement of the sentence." RCW 9.94A.631. This

ORDER GRANTING
MOTION TO SUPRESS - 12

standard is consistent with the Fourth Amendment's reasonableness standard. *United States v. Conway*, 122 F.3d 841, 842 (9th Cir. 1997).

Medrano argues, however, that the probationary-search exception is inapplicable because Officer Taylor searched his vehicle at the request of law enforcement. ECF No. 34 at 5. Medrano argues that under Ninth Circuit precedent, a warrantless search by a probation officer is subject to more limited Fourth Amendment restrictions only when the probation officer initiated the search in the performance of his duties as a probation officer, not as a "stalking horse" for police investigation. ECF No. 34 at 5–7.

A line of Ninth Circuit cases articulates a rule that where a parole or probation officer "acts as a 'stalking horse' to facilitate police investigations by circumventing the warrant requirement," the modified probationary-search standard does not apply. *United States v. Jarrad*, 754 F.2d 1451, 1453 (9th Cir. 1985) (citing *Latta v. Fitzharris*, 521 F.2d 246 (9th Cir. 1975) (en banc)); *see also, e.g.*, *United States v. Butcher*, 926 F.2d 811, 815 (9th Cir. 1991) ("[U]nder no circumstances should cooperation between law enforcement officers and probation officers be permitted to make the probation system a subterfuge for criminal investigations." (quoting *United States v. Consuelo–Gonzalez*, 521 F.2d 259, 267 (9th Cir.1975) (internal quotation marks omitted)); *Smith v. Rhay*, 419 F.2d 160, 162–63 (9th Cir. 1969) (holding that search violated the Fourth Amendment where deputy sheriff enlisted

the assistance of a parole officer to conduct a warrantless search). Whether a probation officer acts as a "stalking horse" turns on the factual question whether the officer independently initiated the search in the performance of his duties. *See Butcher*, 926 F.2d at 815.

The Supreme Court's ruling in *United States v. Knights*, however, effectively eliminated the stalking-horse rule. In *Knights*, a County Sheriff's Department detective conducted a warrantless search of Knights, who he knew was on probation for a drug offense. *Knights*, 534 U.S. at 115. Knights' probation order included the condition that he would "[s]ubmit his . . . person, property, place of residence, vehicle, personal effects, to search at any time, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." *Id.* at 114. The Court considered whether the Ninth Circuit correctly limited the application of this condition to probationary searches. *Id.* at 116. The Court held that it did not. Instead, the Court held that as long as the search condition was itself reasonable, a lesser than probable-cause standard was appropriate: "When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable." *Id.* at 119-21.

ORDER GRANTING
MOTION TO SUPRESS - 14

*Knights* establishes that there is no basis for distinguishing between probationary and investigatory searches by probation officers for Fourth Amendment purposes. *Id.* at 116. Accordingly, the Ninth Circuit has held that the "line of cases holding searches of probationers invalid on the ground that they were subterfuges for criminal investigations is . . . no longer good law." *United States v. Stokes*, 292 F.3d 964, 967 (9th Cir. 2002).

But the abrogation of the stalking-horse doctrine does not mean that any search by a probation officer is constitutional. Instead, there are three relevant questions in considering whether a warrantless search by a probation officer violates the Fourth Amendment: (1) does the probationary search condition permit the search in question; (2) is the search condition itself reasonable; and (3) is the search condition consistent with the Fourth Amendment's reasonable-suspicion standard? Medrano does not contest whether the search condition was reasonable. And Washington's standard probation-search provision, RCW 9.94A.631, satisfies the constitutional reasonableness standard. *Conway*, 122 F.3d at 842. Accordingly the question here is whether Officer Taylor had reasonable cause to search Mr. Medrano's vehicle. *See* RCW 9.94A.631.

**B.      Officer Taylor's search was not supported by reasonable cause.**

A Community Corrections Officer in Washington "may require an offender to submit to a search and seizure of the offender's person, residence, automobile, or

ORDER GRANTING
MOTION TO SUPRESS - 15

other personal property," if the officer has "reasonable cause to believe that [the] offender has violated a condition of the requirement of the sentence." RCW 9.94A.631; *Conway*, 122 F.3d at 842. A valid search under this condition "requires a nexus between the suspected violation and the searched property." *Livingston*, 389 P.3d at 756–57 (citing *State v. Jardinez*, 338 P.3d 292, 297 (Wash. App. 2014)). In other words, the search and seizure must "relate to the violation which the Community Corrections Officer believes to have occurred." *Jardinez*, 338 P.3d at 297 (quoting David Boerner, *Sentencing in Washington: A Legal Analysis of the Sentencing Reform Act of 1981* 1–13 (1984)).

Officer Taylor testified that "the totality of the circumstances led [him] to believe that maybe Mr. Medrano was violating the conditions of his supervision under the laws of the state of Washington," and that based on his training and experience he believed further evidence of those violations would be located in the vehicle. Officer Taylor initially testified that there were several facts that supported his decision to search Mr. Medrano's car: (1) Mr. Medrano had a large amount of cash on him. Officer Taylor said he thought it was "out of character" for Mr. Medrano to have a car and to have a large sum of cash in his pocket because Mr. Medrano had been out of work for some time and was looking for a place to live. It was also concerning to him that the cash was packaged in a large sum in a rubber band, which he said was consistent with drug trafficking. (2) Mr.

ORDER GRANTING
MOTION TO SUPRESS - 16

Medrano was not living at the location he had reported as his residence to DOC. (3) Mr. Medrano had a positive drug screen for methamphetamines about a week before the stop. (4) Information from an unidentified female indicated that Mr. Medrano had been in involved in a traffic incident, possibly a hit-and-run. (5) Mr. Medrano's girlfriend, Ms. Cannon, was a heroin addict. (6) "Confidential information" indicated "that Mr. Medrano was trafficking narcotics." (7) The area where the stop occurred is a high drug-trafficking area. And (8) a safe was visible on the front seat of the car.

The strongest basis for reasonable cause appeared to be that Mr. Medrano had a large sum of money on him, despite not having a job. But when pressed on this, both Officer Brooks and Officer Taylor acknowledged that they had no idea how much money was on Mr. Medrano before Officer Taylor conducted the search. A roll of cash could just as easily be $200 in small bills as it could be—as it was in this case—nearly $4,000 in larger bills. The former should arouse no real suspicion regardless of a person's employment status. The omission of the fact that the officers did not know the amount of money is very concerning, and raises questions about the reliability of their testimony.

The safe on the front seat provided the second strongest basis of support. After hearing the testimony of both Officer Brooks and Officer Taylor, the Court was under the misimpression that Officer Taylor and Officer Brooks could see a

ORDER GRANTING
MOTION TO SUPRESS - 17

1  gray safe on the front passenger seat, and that when Officer Taylor searched the

2  vehicle, he found that *the same safe* contained methamphetamine, guns, a scale,

3  and drug residue. But the Court later learned from Mr. Medrano's testimony that,

4  in fact, there were two safes, and that the safe on the front seat—the only one

5  visible from outside the car—was in its retail packaging. Further, when the car

6  was searched, that safe on the front seat was empty. The guns and narcotics were

7  found in a second safe that was hidden from view.

8        Like the omission about the amount of money on Mr. Medrano, the

9  omission of the fact that the safe was in its retail packaging is very concerning;

10 indeed, it is hard to avoid the impression that this was an attempt to mislead the

11 Court about the evidence. Officer Taylor's testimony very clearly implied that

12 there was only one safe found in the car and there was no mention of the fact that

13 the safe in the front seat was in its retail packaging. What's more, Officer Taylor

14 twice changed his testimony about what he saw when he looked inside the car.

15 First he said that he saw a safe and did not mention any box. When he was

16 recalled after Mr. Medrano testified, he said he could not remember whether he

17 just saw the box or whether he could actually see the safe inside the box. Then,

18 when he was recalled the third time on the second day of this hearing, he said that

19 after reviewing his report, he remembered that he did see "a cardboard box" with

20

ORDER GRANTING
MOTION TO SUPRESS - 18

a "gray-colored or dark-colored safe" inside. But even this third statement is inconsistent with the report itself, which does not mention a box.

If Officer Taylor had known Mr. Medrano had nearly $4,000 in his pocket, and if the safe in the front seat had not been in its store packaging, this would be an easy case. It would be unusual for anyone, let alone an unemployed person with limited financial resources, to have $4,000 in his or her pocket. Similarly, a safe in a car seems very unusual, and combined with the $4,000, would be a reason for suspicion. But Officer Taylor did not know either of those things. He knew only that Mr. Medrano had money rolled in rubber bands in his pocket and that there was a safe *in its original packaging* in the front seat. The fact that a person chooses to carry money in a roll—as opposed to in a wallet, money clip or some other means—is not, in and of itself, suspicious. And there is certainly nothing suspicious about a safe in its original packaging in a car. People buy things at stores, including safes. They often take those things home in their cars, sometimes putting them in the front seat. Because Officer Taylor did not know how much money Mr. Medrano had on him and the safe visible in the car was in retail packaging, those factors are not a basis for reasonable cause.

Without the money and the safe, Officer Taylor was left with Mr. Medrano's criminal history, past conduct on supervision, and his girlfriend's drug use to support the search of his car. Considering these factors exactly as they were

1    first described by Officer Taylor, they are not enough to create reasonable cause to

2    support a search. But even if they were, there are problems with Officer Taylor's

3    testimony here too.

4          Most importantly, Officer Taylor seriously misrepresented or

5    misremembered Mr. Medrano's criminal history. Officer Taylor testified he could

6    not specifically recall Mr. Medrano's past criminal convictions, but he believed

7    Mr. Medrano had at least one drug trafficking conviction. In fact, there was no

8    evidence presented to the Court that Mr. Medrano was ever convicted of, or even

9    charged with, any type of drug trafficking. Mr. Medrano's only drug-related

10   charges or convictions this Court is aware of are for possession. Although an

11   officer's misunderstanding of a suspect's criminal history does not necessarily

12   render a search unconstitutional, *see United States v. Cotterman*, 709 F.3d 953,

13   968 (9th Cir. 2013), the discrepancy here goes to the reliability of Officer Taylor's

14   overall recollection of the circumstances surrounding the stop and search.

15         Officer Taylor's initial testimony also left the Court with the misimpression

16   that Mr. Medrano was not in compliance with his DOC supervision. Specifically,

17   Officer Taylor did not mention, and later claimed to be unaware, that Mr.

18   Medrano had in fact provided a residence where he would be living about a month

19   before this incident. Similarly, Officer Taylor also did not mention, and later

20   claimed he was unaware, that Mr. Medrano had been at the DOC office for a work

ORDER GRANTING
MOTION TO SUPRESS - 20

1  orientation immediately before this incident occurred. Officer Taylor also omitted

2  that Mr. Medrano was in compliance with his supervision on the date he was

3  arrested and that he was scheduled to be off supervision in two weeks.

4          The omissions and apparent misrepresentations by Officer Taylor and Officer

5  Brooks are very concerning to the Court. The Court has little confidence in the

6  reliability of either officer's testimony.

7          Given the facts as the Court now understands them, while Officer Taylor had

8  reasonable cause to believe Mr. Medrano had violated a condition of his sentence by

9  driving with a suspended license, there was no nexus between that conduct and the

10 search of Mr. Medrano's vehicle. Mr. Medrano was stopped at nine-thirty in the

11 morning, he was arrested only for driving with a suspended license, Officer Taylor

12 did not know that Mr. Medrano was carrying an unusually large amount of cash, the

13 safe on the front seat of the car was in its retail packaging, Mr. Medrano had no

14 previous drug-trafficking charges or convictions, and Mr. Medrano was in

15 compliance with his supervision. Officer Taylor lacked reasonable cause to believe

16 Mr. Medrano was engaging in any conduct in violation of a condition of his sentence

17 for which he could reasonably expect to find evidence inside Mr. Medrano's vehicle.

## IV.    CONCLUSION

19 For the reasons discussed, **IT IS HEREBY ORDERED**:

20      **1.**      Defendant's Motion to Suppress, **ECF No. 34**, is **GRANTED.**

ORDER GRANTING
MOTION TO SUPRESS - 21

2.    All evidence seized directly or indirectly as a result of the vehicle search conducted by DOC Community Corrections Officer Jeremy Taylor on March 28, 2017, is inadmissible at trial.

**IT IS SO ORDERED.**  The Clerk's Office is directed to enter this Order and provide copies to all counsel.

**DATED** this 20th day of September 2017.

_____
SALVADOR MENDOZA, JR.
United States District Judge

ORDER GRANTING
MOTION TO SUPRESS - 22